Good morning, Your Honors, and may it please the Court, my name is Shelby Leighton, and I represent Plaintiffs' Appellants Dr. Scott Crawford, Stefan Namasnak, and Frances Falls. They're users of electric wheelchairs in Jackson, Mississippi, and New Orleans, Louisiana. And what they've requested from Uber is simple. They would like the opportunity to use Uber's platform in their cities to match with a driver of a wheelchair-accessible vehicle, called a Wave, just as wheelchair users in other cities can. Although Uber provides a marketplace for Waves in 11 U.S. cities, it has refused to do so in Jackson and New Orleans, and it, in fact, effectively bans Wave drivers from operating on its platform in those cities. That violates two sections of the ADA. First, it violates the section prohibiting eligibility criteria that tend to screen out people with disabilities, unless those criteria are necessary. Second, it violates the section that requires Uber to make reasonable modifications to its policies, practices, and procedures that are necessary to afford people with disabilities access to its services. In ruling that Uber did not violate either of these provisions of the ADA, the district court committed three errors. First, with regard to the screened-out claim, it erred by holding that appellants must show that the eligibility criteria, quote, alone screened out people with disabilities. Second, with regard to the reasonable modification claim, it made two errors. First, it applied a burden of proof for reasonableness that is inconsistent with case law interpreting the ADA. And second, in assessing how to provide Wave service, it did so in assessing each method in isolation without assessing the combination of methods, including ending the Wave banning criteria that is the basis of plaintiff's screened-out claim. I'll start with the screened-out claim. So the district court held that the criteria alone had to screen out people with disabilities, but that sole cause requirement has no basis in the statutory text or the case law. Although, if I could interrupt for a moment, although the district court used the word alone, the thrust of the district court's analysis seemed to be that what was preventing plaintiffs from having, from enjoying the full access was the lack of supply and not the limitation on after, after markets in modification. And the district court indicated that the supply was so low that the after modification ban wouldn't have an effect on availability. What's your response to that? Sure. So a couple of things. One, I think the district court basically said that if you don't have the option to among all the UberX options, it would be very, very, very small. And we don't disagree with that, which is why we've also requested that Uber make the modification of turning on Uber Wave. And our position is that Uber can't point to another thing it has done to create a barrier for access as a reason for not making a change to the Wave banning criteria. Did the district court find that there just was an inadequate supply of waves to begin with and that these criteria were not what was dampening that? Right. So I think it was both the inadequate supply and the ability to request waves on demand. There is record evidence that there is a supply of waves in both cities. There is a document from Uber that listed five Uber drivers on the platform in 2017, despite these Wave banning criteria. And there was also testimony regarding Wave operators in Jackson who could provide Wave service if Uber allowed them to. Is your theory that if these restrictions were removed, more people would go out and request waves and then start driving them, or that there's just some existing supply of waves that's already out there that could then be used? I think it's a combination of both. So there's some people with waves that already provide Wave service or would like to provide Wave service but can't do it via Uber's platform. So, for example, in Jackson, Mississippi, Dr. Crawford testified that there were some you can call them on the phone and you give them a few days notice and they'll come get you. And presumably people like that would participate in Uber's services if they were allowed to, which currently they're not. And if there was a way for them to offer their services and allow people to request it through the Uber app, that would be beneficial to them and to plaintiffs. And similarly, as I said, in New Orleans, there's existing Wave operators who are already driving for Uber and they simply don't have the option to have someone request their Wave services. But I also think that there's lots of evidence that in other cities what Uber does is incentivize people to do things like rent Waves or purchase Waves. And that would also be something that Uber could do here to supplement the supply of existing Wave drivers that there's already evidence of. Do you dispute that there is a proximate cause requirement under B1? Yes, Your Honor. You think there's just no proximate cause requirement whatsoever or you think there's not a heightened one that it would be the sole cause or the alone cause? We think there's no proximate cause requirement whatsoever. The cases that Uber cites for the proximate cause requirement have to do with prudential standing, which is a question of whether the plaintiffs are within the category of people that the statute is designed to protect. And so here, people with disabilities are the people that the statute is designed to protect. The statute prohibits screening out people with disabilities, and that's exactly who our plaintiffs are and what they're challenging. I think what Uber is really saying is that we haven't met our burden of showing that the criteria screen out those people with disabilities, not that there's some proximate causation requirement between what Uber has done and who these plaintiffs are. So I would encourage the court not to add a new element to the elements that already exist in the case law for a screened out claim. The cases that have interpreted the section of the ADA or the tends to screen out language have found that any barrier that diminishes an individual's chances of access to the service is sufficient to prove a screened out claim. Even a very, very small percentage chance, right? I think that seems to be the district court's fundamental problem here is that none of this would change anything for people who are trying to get these rides. And so your argument seems to be, well, it might change a little bit and that would be enough. Right. So we have to show that it diminishes their access. So if we don't show that it diminishes their access, then we haven't carried our burden under the statute. We believe that we have, that even screening out one way from the service greatly diminishes plaintiffs' chances of matching with a wave and being able to use it. The district court made a lot of findings about the low supply in those cities and at various suggestions that plaintiffs made like incentive program, rental company model, dispatch service, that none of those would be effective. Are those fact findings? Are we reviewing those for clear error? The findings about their effectiveness would be, I think, factual findings or at least mixed factual and legal findings. But our contention is that the district court applied the wrong standard by where it placed the burden and also not looking at how those things work together in combination. So the finding that, for example, an incentive program hasn't been effective under some circumstances, that's reviewed for clear error. But the district court's failure to then say, well, an incentive program, why don't we look at an incentive program combined with a rental program and see if incentivizing people to rent would be more effective than simply just incentivizing people to go out and buy their own waves. So it's the legal error that we're pointing to is the district court's failure to look at these methods in combination with each other and assess whether not just whether a commercial operator option would work, but also would a commercial operator option work in combination with independent operators working on the system at the same time. And that's what Uber does in other cities. So in most other cities, Uber has, you know, they partner with a commercial operator to but then they also have independent Uber drivers who have waves or who are renting waves that they incentivize to accept wave rides on the platform. And that's what we're arguing for here. And in fact, the data provided by Uber shows that across the country, more than half of the rides are not provided by commercial operators. And so for the district court to look only at the commercial operator option and say, well, that's too expensive and not effective enough, is to miss all the other ways that Uber provides this service in other cities that, you know, there's no evidence why that wouldn't be equally as viable in New Orleans and in Jackson. One of those options is in New York, where they have regulatory provisions that require the competitors to work together to meet requests for rides on their platforms. That doesn't exist anywhere else. So when you say there's no evidence that this couldn't be done elsewhere, it seems that there is and that the district court considered that. Sure, that one option about the central dispatching system is unique to New York. But the other options, like providing a rental service, is done in multiple cities. The incentives are done in multiple cities. And then there's also just the evidence of the independent operators that already exist in New Orleans that could, you know, get the program off the ground right now with much less of a commercial investment than the district court assumed. So Uber put in evidence that they operate at a loss in the cities where they have UberWave, pretty significant loss. And they also put in evidence about the cost per ride in Jackson and in New Orleans being $400,000 to $1,000 per ride. And the district court concluded that just wasn't a reasonable accommodation. What do you say in response to that? So a couple of things. I think, again, the cost is based on only using a commercial operator. And we've put on evidence that using a commercial operator in combination with incentives for people that already have waves and are already on the platform would be a more cost effective and more effective way of providing the service. So instead of it costing the amount per ride that the district court was focused on, it would cost less because they wouldn't have to be paying a commercial operator for their time. Plus the service would be more effective because there would be more waves on the road. And so that's what the district court failed to consider is not just taking the highest possible number, but looking at other ways that you could combine the commercial operator option with some of the other options to make it feasible, which is, again, even if Uber says that those options haven't been effective in other cities, that's what Uber does in other cities is provide commercial operator service and also service with independent operators. And I'd like to reserve the rest of my time for rebuttal. Thank you. Thank you. Good morning, Your Honors. Thank you. And may it please the court, I'm Stephanie Schuster here on behalf of Uber Technologies and Resier LLC, the defendants below. I want to start with something that occupied a bit of the last argument, which is this argument about a combination of incentives and commercial fleet operator arrangements. This is, one, an argument the district court thoroughly considered, but I raise it first because it's an argument not raised in the appellate briefing. The combination raised in the appellate briefing is that the district court should have considered the combination of turning on the wave option and changing the vehicle requirements for UberX. So the argument, in addition to being contrary to the evidence, which found that incentives are ineffective, the rental partnerships are ineffective and are no longer operational. There's no leasing partner. You can't do the dispatch model outside of New York. You know, ineffective plus ineffective is still ineffective. The district court carefully considered the evidence and found the commercial operator arrangement, while the most expensive, is the only effective way to provide meaningful and a functional wave platform. But the other thing is also waived. And so I just want to flag that at the top. In addition, after hearing and weighing all of the evidence at trial, the district court determined that plaintiffs failed to prove either of their claims. They failed to present any non-speculative evidence that Uber could support wave marketplaces in Jackson or New Orleans at anything close to reasonable cost, which was fatal to the reasonable modification claim. And they failed to present any non-speculative evidence that clarifying an UberX vehicle requirement would enable them to obtain wave rides on demand, which was fatal to their eligibility criteria claim. On appeal, plaintiffs essentially fault the district court for holding them to their burden of proof. First, for the modification claim, plaintiffs argue for the first time that theirs was a mere burden of production to show that it was possible for Uber to fulfill their demands. On their theory, the burden then shifted to Uber to produce evidence showing that the cost of doing so was unreasonable. That is contrary to precedent and to the plain language of the statute. The term reasonable doesn't mean merely possible. Second, for the eligibility criteria claim, plaintiffs argue that proximate cause is not an essential element. It's settled, however, that proximate cause is presumptively an element of every statutory cause of action. And there is nothing in the ADA's text that shows Congress intended to override that presumption with this statute. The plaintiffs focused on the district court's use of the word alone. Do you think that was correct or do you think that was errant? How do you respond? I think the use of the word alone, the district court formulated it a few different ways. It does not need to be the sole cause. So it perhaps was errant, but the district court did clearly articulate that it wasn't the elsewhere in the decision. It was not the eligibility requirement, the vehicle requirement itself that caused plaintiffs claims injuries. It was the absence of way of supply, meaningful supply on the ground in either city. And that is due to no action of Uber. That is because few people have need to purchase these expensive vehicles and fewer still have desire to use them for ride sharing. Can we go back to the combination theory that you led with or were starting to respond to? In terms of the incentive fee plus the commercial partnership, would those be two different sets of drivers? In other words, you wouldn't give an incentive fee to somebody who was part of a commercial driver program? That's correct. Okay. That's correct. And Uber has tried that. And that's what the evidence showed that the managers of the way program testified at length about how that has been tried in other cities. And just it's not anywhere near enough the incentives that Uber can provide to overcome the sort of delta in acquisition costs and maintenance costs for these vehicles. They're not an effective means of getting any sort of meaningful supply on the ground. But just because one of the options discussed was a commercial fleet partnership, but that would not be the population of people receiving the incentive fee? Correct. Because the commercial fleet partnership make that work. What Uber has to do is pay the commercial fleet operator to put its waves and its drivers on the platform for a specified period of time. This metric called the supply hour. It's an hour with the driver logged onto the platform in the specific vehicle. They pay that regardless of this sort of rate, regardless of how many rides are actually taken and for how much revenue. And that's why it's so expensive. Because in order to have the availability to respond to the request when there is demand, you have to have drivers unoccupied and on the platform in order to make that work. Incentives would go to the individual who wants to use his or her personal vehicle to drive on the platform, what they call independent operators. That's just sort of peer-to-peer ride sharing. And what the record shows is that there are just very few people who have waves or have need to purchase. Again, these are very expensive vehicles to acquire. They're up to $60,000 new, $20,000 to convert. They're purpose-built. They're purchased by people who need them. And when you have the small population that has them, there's an even smaller population that wants to use them for ride sharing rather than for transportation of family members for whomever they purchased them for. So turning back to the reasonable modification claim, plaintiffs failed to carry their burden of proving that Uber or anyone could meet their demands at reasonable cost. And I want to focus specifically on what their demands were. They demanded a wave-specific request option, large fleets of up to 60 wheelchair-accessible vehicles in each city, plus equivalent service when compared to UberX. The district court found Uber would have to spend $400 for each trip in New Orleans and $1,000 for each trip in Jackson to come up with a program that wasn't even close to what plaintiffs requested. You'd have two or three waves, not 60, on the ground providing bare minimum levels of service, not equivalent service in each city that would have shoddy reliability at best, but would be to the bare minimum to have some functionality on the platform. Costs like that are so disproportionate to the benefit that they are unreasonable on their face. Plaintiffs attempted to and cannot carry their burden of proof by suggesting that Uber merely raised prices across the board to cover their costs. Nothing in the ADA suggests Congress intended to require companies to make any and all requested modifications, no matter the cost, so long as that cost could be passed on to consumers in the form of higher prices. That just-raised-prices approach would eliminate costs from the analysis in every reasonable modification case because every entity can simply raise prices, and every public entity can simply raise taxes. Yet this court has made clear that the costs of implementation are key to determining whether a modification is facially reasonable. Can you address the burden? The plaintiffs say, well, this is really your burden to prove it's reasonable. I know your position is you did do that, but just on the legal point of who has the burden, what's your answer? Certainly, Your Honor. The plaintiffs have the burden. They have the burden of proof on reasonables, and while there's different formulations of this in their brief, they ultimately don't dispute it. They make very clear in their reply brief it's their burden to prove. What they argue is that they should have to have a mere burden of production at the outset to show a possible modification, and then it is on Uber to show that it's financially unreasonable, the cost element. And that is inconsistent. It is inconsistent with the precedent they cite. This court rejected a nearly identical argument in 2018 in the SNAP case where the plaintiff in a Title I case said district court failed to it was a jury trial, should have instructed the jury that his was a mere burden of production, citing to the Barnett versus U.S. Airways case the plaintiffs rely on. So that just showed there's just a minimal burden for plaintiffs in reasonable accommodation cases, and this court flatly rejected that, said nothing in Barnett said in any way to minimize the burden. Burden of reasonableness falls on the plaintiff. The plaintiffs are sort of conflating concepts of undue hardship, the defense in Title I with reasonableness. Undue hardship is more than about costs. You can have, and Barnett explained this, and the Seventh Circuit explained this well in the Zand case. You can have a modification, hypothetically, that would be, the cost would be facially reasonable, would seem proportionate, not much. But then the defendant can show an undue hardship in a Title I case by saying, well, actually for that particular defendant, it might cause them to go out of business or to have them change their hours of operation and therefore, you know, no longer be able to operate in the same way that they were before. But what we have here are facially unreasonable costs, $1,000 per ride, $400 per ride for unreliable service, which is the opposite of what plaintiffs said that they want. Meaningful, reliable, on-demand rides in WAVES to be able to be requested. They call it the near equivalent, wraparound equivalent, close to equivalent, but they want meaningful and reliable service at the very least. And having service that's unreliable is simply just not what they demanded. But it seemed in their briefing, they were saying, no, that's not what we want. We just want the WAVE platform, the option to be turned on. And what would be the problem with that? Uber just said, okay, we'll turn on the WAVE platform, but you understand there's very few vehicles available. So the service is not going to be reliable. Why isn't it a reasonable accommodation just to do that? So a few responses to that. One, it doesn't accommodate any disability to turn on a meaningful, sorry, a meaningless option. The evidence at trial showed, and the plaintiffs don't dispute, that simply turning on the WAVE option does not result in an actual WAVE marketplace. What you would have, and the district court found this, what you would have is an option where people go to request rides and it says no drivers available. So, and Uber's not in the business of putting out bad customer experience or a meaningless option. When it has enabled WAVE options in the 11 major cities where it has this, it ensures that there is a meaningful supply so that it is a useful and functional platform as opposed to one where there's just an option. But my second response to that would be that the plaintiffs themselves in sworn testimony, unchallenged, unchanged at trial, said that that's not what they want. They said, and I quote, it would be meaningless to them. It would be a meaningless gesture. It would be useless to them. And they have no interest in an option where they can just request a ride, but none shows up. What they want is to actually be able to get WAVE rides on demand and be able to request them with their app. Plaintiffs say in their reply brief, well, that's not their litigation position, even though that's their sworn testimony. But the sworn testimony is the evidence. And that's what they're stuck with. And that's what they testified to. They had an opportunity to attempt to change that theory at trial. They didn't. They've made clear what it is that they want. And that's the ability to reliably request WAVE rides. Simply requesting to turn on an option on appeal to make it seem more reasonable does not satisfy their burden of proof. And on that point, and I just want to get back to sort of where we started, they had to prove that the modification they requested is reasonable. In their briefing, they fault the district court for not considering that combination of turning on the option and changing the UberX vehicle requirements. But that is not what they ever requested. And the evidence shows, again, that turning on that option would do nothing without Uber intervening in affirmative ways to prop up and subsidize supply. Turning to the eligibility criteria claim, plaintiffs do not challenge any rider eligibility requirements. They challenge a vehicle rule for UberX drivers that prohibits aftermarket seating modifications like seats that are bolted to the bed of a pickup truck. Because many WAVEs are converted minivans, the district court found that this rule may render some WAVEs ineligible for UberX. But plaintiffs failed to prove that this rule was the proximate cause of their claimed injury, not being able to request and obtain a WAVE ride on demand. Now, opposing counsel mentioned the tends to language in the statute. The tends to language doesn't eliminate the proximate cause requirement or expand it beyond the first step of the causal change. It reaches rules that screen out people with disabilities, even if not overtly or expressly. And the Department of Justice has illustrated this in its guidance with an example. That guidance is prohibiting shoppers from paying by check unless they're able to present a valid driver's license would be a rule that tends to screen out people with disabilities and those people being individuals with vision impairments so severe that they're unable to drive so they don't have a driver's license. But in that example, the driver's license rule operates directly on a person who is blind. For example, it is not operating on a third person who then has to make choices that then may have a ripple effect upon the plaintiff. Here, what we have is multiple steps removed from the driver and the hypothetical driver that has a wave and wants to sign up and is turned away because of the challenge vehicle rule. I want to highlight that there is no evidence in the record of a single driver who attempted to sign up and was turned away. There's no evidence of a single driver who was considering signing up but saw the challenge rule and decided, I'm deterred. I'm not going to sign up. I'm not going to attempt to it. There's just simply no evidence of additional supply that could be out there. There's certainly no evidence linking any of Uber's actions, be it the absence of a wave button or the seating modification rule as having any effect on dampening supply of waves in these cities. Then finally, I just want to turn very briefly to the alternative ground we raised in our brief as well, which is that overall, putting all of these facts aside as a matter of law, Title III of the ADA does not require companies like Uber to provide wave service. Congress struck a very careful balance in Section 12184 when it comes to private entities obligations relating to waves. Those obligations apply only if a covered entity acquires a new van. Per subsections B3 and B5, that van must be a wave unless the entity can show that it already provides equivalent wave service. But an entity does not ever have to acquire a new van. As the 10th Circuit put it, a covered entity can keep a fleet of entirely inaccessible vehicles and intercessible automobiles, no waves, and be fully in accord with the ADA. And the Department of Transportation has repeatedly said the exact same thing. A covered entity need not acquire any vehicles, automobiles, or anything other than used vans without triggering obligations to provide waves and can still operate in accord with the ADA. These waves specific provisions in B3 and B5 trump the general provisions in B1 and B2 at issue here about eligibility criteria and reasonable modification. So by their terms, those sections don't apply to Uber because Uber doesn't purchase new vehicles, right? That's correct, Your Honor. So by their terms, they're just irrelevant. We're just looking at 12184A. I don't see why the fact that some provisions are inapplicable to Uber means that Uber doesn't have to comply with the anti-discrimination requirement. It's a good question, Your Honor. And what we have is that the ADA is very specific in those provisions in B3 and B5 when you have to acquire an accessible vehicle and when you have to provide wave service. That's what B3 and B5 show. And because those provisions don't apply here, because Uber has not acquired a new van, that doesn't mean that you can then look to a general provision like the reasonable modification provision or the eligibility provision to somehow then force Uber to provide wave service. The specific governs the general canon, requires that result as a matter of just statutory construction. And it's also very unusually well spelled out in the legislative history that that was not Congress's intent. I see that my time has expired. So unless the panel has any further questions, we would respectfully request that the judgment be affirmed. Thank you. Thank you. I just want to briefly address a few points. To begin with, what plaintiffs are demanding here is service that is the same as the service that Uber provides in other cities. Uber has done this in 11 other places. It knows how to do it. We're not asking the court to order a specific way of doing it or to provide equivalent service in those other cities. The service is not equivalent. The wait times may be longer, but someone can open the Uber app, have an option to request a wave and have one come within, you know, a reasonable amount of time. And so isn't the district court's finding that that could not happen here except for extraordinary cost? Yes. And so, you know, what we've challenged that finding, I think, first of all, because it was focused on only the most expensive option, which is the commercial operator option. And you had asked about the incentives in combination with the commercial operator option. And so the commercial operators are a standalone system where you, I think the evidence in the record was that Uber would pay for three wave vehicles to be available at any given time and a certain amount of what are called supply hours. And so what the district court looked at is saying, well, only three vehicles available at a time. That's not enough, right? That would be not effective service. But what it failed to look at is that, for example, in New Orleans, there's five people that are not commercial operators that have waves that are on the Uber platform that could also participate in the wave marketplace. So instead of there just being three operators from the commercial operator on duty at any particular time, there might be four or five waves on duty at every time. And Uber itself has acknowledged that in New Orleans, only as few as seven waves would be necessary to have effective wave service. And so we're not looking at huge numbers here. And the fact that you could combine people who have their own waves with the commercial operator would lead to a more effective service than what the district court looked at, which was just looking at the commercial operator by itself. And then in addition, the district court didn't take into account the fact that currently Uber bans most waves from its platform. So rather than there being five wave drivers on the platform in New Orleans, there might already be seven or nine waves if you ended that wave banning criteria. And then so what we're asking for is basically for Uber to turn on the option to request a wave and the wave banning criteria, and then look at that and say, is this enough wave service? And if not, they can do things like provide incentives. They can provide rentals. They can provide the commercial option. But the first step has to be just allowing waves to participate in its platform and allowing people to request waves. And I believe my time is up, but I can. It is. Yeah. The song is not going up. It's going the other direction. Yes. Sorry about that. Thank you. Thank you. Thank you. Thank you both for your arguments. We're very helpful. And this case is submitted and we are adjourned for today.
judges: IKUTA, BADE, BRESS